NOT DESIGNATED FOR PUBLICATION

No. 117,040

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID JOHN DAVIS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed December 21, 2018. Affirmed.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Christine M. T. Lader*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., HILL and BUSER, JJ.

BUSER, J.:  This is an appeal by David John Davis from the district court's denial of his pro se motion to amend or alter judgment. In the motion, Davis sought reconsideration of the district court's denial of his motion to file a notice of appeal out of time. Following an evidentiary hearing, the district court again denied the motion. On appeal, Davis contends that he should be allowed to appeal out of time because his attorney inadequately consulted with him about the advantages and disadvantages of appealing after the State filed a notice of appeal of Davis' departure sentence. Upon our review, we find no reversible error and affirm the district court.

1

FACTUAL AND PROCEDURAL BACKGROUND

On August 29, 2008, a jury convicted Davis of one count of rape of a child under 14 years of age, an off-grid person felony. The victim was 13 years old when she and Davis engaged in sexual intercourse. Davis was 22 years old at the time.

Richard Comfort, Davis' defense counsel, filed a motion for a durational and dispositional departure prior to sentencing. At sentencing, on December 30, 2008, Comfort argued that a departure sentence was appropriate because of Davis' mild mental retardation, the voluntary participation of the victim, the degree of harm was less than typical for this offense, and imposition of a Jessica's Law sentence of a minimum 25 years without parole to life imprisonment was cruel and unusual punishment under the circumstances.

In response, the State asked the district court to "only grant the departure in terms of departing to the Kansas Sentencing Guidelines and the appropriate sentence within the grid box that the defendant is assigned to." Defense counsel objected to the State's recommendation which, according to defense counsel, amounted to about 272 months in prison. The State opposed a dispositional departure.

The district court granted the durational departure, but it denied the dispositional departure. The district court found that the victim's participation, Davis' mental impairment, and the lesser degree of harm as compared to other similar cases amounted to substantial and compelling reasons to sentence Davis as part of the Kansas Sentencing Guidelines rather than off-grid. Davis was sentenced to 36 months in prison with lifetime postrelease supervision.

At the conclusion of the sentencing hearing, the district court informed Davis:

> "You have ten days—Mr. Davis, you have ten days from today to file a notice of
> appeal of any adverse ruling of this court. And if you wish to file an appeal and cannot
> afford an appellate attorney, the court will appoint an attorney to represent you on an
> appeal. And your attorney can visit with you regarding your appellate rights."

Davis did not request the appointment of appellate counsel or file a direct appeal within the statutory 10-day time period. The State, however, filed a notice of appeal of the departure sentence on the last day permitted, January 13, 2009. Davis did not file a cross-appeal. About one year later, on January 25, 2010, on a motion by the State, the district court dismissed the State's appeal. The record on appeal does not show any indication that the State's appeal was ever docketed or prosecuted in the Kansas appellate courts.

More than seven years after he was sentenced, on July 14, 2016, Davis filed a pro se notice of appeal or in the alternative a request for an *Ortiz* hearing. See *State v. Ortiz*, 230 Kan. 733, 640 P.2d 1255 (1982). In support of his request, Davis mistakenly stated that Christina Trocheck had filed a notice of his appeal but through "some chain of events that is not clear from the record." Davis' appeal was later dismissed.

In the motion, Davis directed the district court's attention to *Ortiz* and argued that the second *Ortiz* factor—relating to the right of an indigent defendant who had appointed counsel at the district court level to be entitled to have counsel appointed for the purpose of appeal—applied to the facts of this case.

On August 3, 2016, the district court filed an order dismissing Davis' notice of appeal or request for an *Ortiz* hearing. The district court noted that Trocheck was not

Davis' defense attorney but the prosecutor who represented the State in the prosecution of the case. The district court provided the following analysis:

> "At the time of defendant's sentencing, Kansas law required that an appeal be filed with 10 days of sentencing. The filing of a timely notice of appeal is jurisdictional. The failure to file a timely notice of appeal requires the dismissal of the appeal. *State v. Patton*, 287 Kan. 200[, 195 P.3d 753] (2007). . . .
>
> "After reviewing defendant's motion and the court file, the court finds that contrary to defendant's statement, he did not file a notice of appeal within ten days. The court finds, from a review of the record of the sentencing hearing, that defendant was advised at sentencing that he had ten days to file a notice of appeal of any adverse ruling of the court, and if he was unable to retain counsel, the court would appoint an attorney to represent him on the appeal. In his motion, defendant did not allege that he asked his attorney to file an appeal. The court file does not reflect that the defendant had ever asked that appellate counsel be appointed. The defendant does not allege in his motion that he had asked his attorney to file an appeal that he had failed to perfect or complete it. The court finds that defendant has failed to allege or demonstrate that an exception to the requirement that he file an appeal within ten days from sentencing applies."

On August 11, 2016, Davis filed a pro se motion to alter or amend judgment, asking the district court to reconsider his request to file an appeal out of time. In the motion Davis argued that he mistakenly thought the State's notice of appeal was filed by his attorney. Additionally, Davis stated, he "thought that he would be contacted by attorneys regarding the appeal but never was. He always intended to appeal his conviction, and told his attorney this at sentencing." Davis reiterated his request to file an appeal out of time or, in the alternative, for the district court to hold an *Ortiz* hearing.

In response, the district court appointed a new attorney to represent Davis and an evidentiary hearing was held on November 4, 2016. At the hearing, the district court heard testimony from Davis and his prior defense counsel, Comfort.

4

Davis testified that he had served 36 months' imprisonment but had violated his parole and had been incarcerated since June 18, 2013. He testified that he expected to be released from prison whenever he had an approved plan. Davis told the court that he has "mild minimum retard[ation]" and has difficulty understanding the law. As a result, another inmate helped him write and file his pro se motions in the district court.

Regarding his criminal case, Davis testified that he remembered having a trial, being convicted by a jury, and being sentenced. Davis testified that although he did not recall the district court orally informing him of his right to appeal, he did receive a copy of the journal entry of sentencing dated January 8, 2009, which stated that he had the right to file a notice of appeal. Davis testified that he did not file a notice of appeal. Still, Davis testified that at the time he was convicted he intended to appeal his conviction. According to Davis, after he was sentenced, he did not talk to Comfort about filing an appeal.

Davis reiterated that after sentencing and before he was incarcerated at the El Dorado Correctional Facility, he did not ask Comfort to file an appeal. According to Davis, the reason he did not advise Comfort to file an appeal is because: "At the time I didn't know what to do, . . . I'm not really good at understanding what should I do next."

At some unspecified time while Davis was incarcerated, he was going through his legal papers "trying to figure out how I can overturn this whole conviction," when he found a notice of appeal which he mistakenly thought was his appeal. Davis testified that at this time he intended to file an appeal but he did not do it because he had difficulty understanding the law and asking inmates for assistance.

According to Davis, after he was incarcerated, he sent letters to Comfort on a couple of occasions. In one of those handwritten letters, Davis said he asked Comfort to appeal his case. Davis testified that he did not keep a copy of that letter but "destroyed

5

the evidence." Davis explained, "I destroyed it. I figured it was no use for me to have it anymore, because if I can't get an appeal it's no use for me to try to file it." Davis testified that after he sent the letter, Comfort replied, "Your notice of appeal was out of time of the 15 days. . . .You already did the crime, go do the time, or something like that. I can't remember; it's been so long." Under cross-examination, Davis clarified that, in fact, he had destroyed Comfort's letter in response to his own handwritten letter sent to Comfort.

At the hearing, Comfort testified that he had 36 years of experience in criminal law, including 12 years as the Ottawa County Attorney and 8 years as an attorney with the Kansas Board of Indigents' Defense Services. Comfort brought his file regarding the Davis criminal case to the hearing. During his testimony, he relied on documents and contemporaneous notes he had written to refresh his recollection.

Comfort testified that the district court orally advised Davis at sentencing of his right to appeal within 10 days of sentencing. In particular, Comfort testified, "In my chronology notes that were made contemporaneous with the hearing, it does indicate that [Davis] was advised [of] the 10-day right to appeal, and then it's also reflected in the journal entry . . . ."

In addition, Comfort testified that after the sentencing hearing on December 30, 2008, he met with Davis and his family to discuss whether to appeal. Comfort recalled, "On December 30th, my notes indicate that I discussed the appeal with defendant and his family. I was advised at that time, [d]o not file appeal."

Comfort indicated that, on the same day, he spoke with Davis again, but his notes did not indicate whether Davis said to file an appeal or not. With regard to the second meeting, Comfort surmised that he probably had encouraged Davis to file an appeal because he thought the constitutionality of the lifetime postrelease mandate was an arguable issue. Comfort testified:

6

"But we also had to consider how that would reflect on what might be done with an appeal, and we knew [an appeal] was going to be filed by the State, objecting to the degree of the durational departure, and whether it would complicate it, compromise it, or anything like that. That's the analysis that I recall going through, is you know, could we win it? Was there a reasonable chance of changing the legislature through that iteration of the Supreme Court? And my opinion was no, and there's some notes in here, and a lot of research. But it was—it would have been [Davis'] choice, and I would have honored his request."

Comfort testified that he believed Davis understood what he had explained to him about the procedures and legal issues of the case. Moreover, he had discussed a possible appeal with Davis "at great length."

Comfort was aware that the State filed a notice of appeal of the district court's durational departure sentence. He noted the State was "unhappy with the length of the durational departure." Davis received a copy of the notice of appeal and was "fairly comfortable" that his office would have forwarded a copy of the notice and journal entry to Davis at the El Dorado Correctional Facility.

Comfort testified that Davis wrote him a one page letter dated April 17, 2009, which he received on April 21, 2009. Comfort read from the letter which indicated that Davis had not received the journal entry, that he "did not get a fair trial, so I'm going to find help to get my appeal going," and requesting "all the paperwork of my case. Mean all of it. I need to get my transcripts too." Davis also indicated that he was having difficulties with other inmates "because people want to hurt me because [of] my case, which was predicted."

Comfort testified that he responded to Davis on the same day he received the April 17, 2009 letter. In his letter, Comfort enclosed a copy of the journal entry. Comfort read his letter to Davis into the record. In relevant part he had written:  "My appointment as

your attorney expired 10 days after your sentencing. My review of your proceedings convinced me that no basis supported an appeal, which was required to be filed within 10 days of your sentence." Comfort counseled Davis to "tread very lightly, keep your mouth closed, and watch your back at all times." Comfort was unaware of any other correspondence or further contacts with Davis.

More than five years later, however, Comfort acknowledged sending Davis a letter, dated September 10, 2014, in response to correspondence Davis had sent. Comfort read from his letter to Davis, which stated that he had reviewed Davis' letter with a superior:

> "[W]e filed the appropriate postrial motions which were denied by the Court. A second level of legal and judicial analysis occurred via your appellate case in this matter. In addition, a third avenue of judicial review was provided to you, procedural vehicle of K.S.A. 60-1507. You do not indicate whether you have sought relief utilizing this Constitutional statutory remedy. Based upon the information we possess concerning the status of your case, we are unable to identify any legal, procedural vehicle upon which you could base a claim for relief."

At the hearing, Comfort confirmed that the second level of analysis referenced in his letter related to the State's appeal of the sentencing departure. For all the reasons stated in his letter, Comfort declined to provide Davis a copy of the entire legal file.

At the conclusion of the hearing, the district court took the matter under advisement and issued a detailed oral decision on November 29, 2016. After making factual findings, the district court summarized Comfort's testimony and stated: "Mr. Comfort testified that if defendant had requested that he file an appeal, he would have honored that request. The Court found Mr. Comfort's testimony credible, that he had discussed with the defendant his right to appeal and that the defendant did not want him to do so." The district court then rendered its legal conclusion:

8

"In State vs. Ortiz, the Kansas Supreme Court held that a limited exception to the general rule requiring a timely appeal from sentencing is recognized in the interest of fundamental fairness only in those cases where an indigent defendant was either not informed of his right to appeal; secondly, was not furnished an attorney to perfect an appeal; or, third, was furnished an appeal for that purpose who failed to perfect and complete an appeal.

"After considering the file and the evidence presented, the Court finds that defendant was informed of his right to appeal by the Court at sentencing, that defendant was represented by an experienced criminal defense attorney who discussed with defendant his appeal rights with his family present on December 30th, 2008, following sentencing.

"The Court finds the defendant did not request that Mr. Comfort file a notice of appeal of his conviction or sentence within 10 days following sentencing. Defendant does not allege and has failed to show that he was furnished an attorney . . . who failed to perfect and complete an appeal.

"The Court concludes that the filing of a timely notice of appeal is jurisdictional. Defendant failed to file an appeal within the 10-day time period set by statute. And he has failed to show an exception applies. Defendant's motion requesting to file an appeal out of time should be and is denied."

Davis timely appealed the district court's decision.

## ANALYSIS

On appeal, Davis asserts: "The third *Ortiz* exception should apply to allow the late filing of Davis' notice of appeal because defense counsel inadequately consulted with Davis about the advantages and disadvantages of appealing after the State filed notice that it was appealing Davis' departure sentence."

We begin with a brief summary of our standards of review. A district court's decision regarding whether an exception under *Ortiz* applies in a given case is reviewed on appeal under a dual standard. First, the appellate court reviews the facts underlying the

9

district court's ruling for substantial competent evidence. However, the legal conclusion made by the district court on those facts as to whether the exception applies is reviewed de novo. *State v. Smith*, 303 Kan. 673, 677, 366 P.3d 226 (2016). "'Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved.'" *State v. Lewis*, 54 Kan. App. 2d 263, 270, 399 P.3d 250 (quoting *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 [2009]), *rev. denied* 307 Kan. 991 (2017).

At the outset, Davis contends that substantial competent evidence did not support the district court's conclusion that he had advised Comfort not to file an appeal. In particular, Davis highlights that Comfort's notes with regard to the second conversation he had with Davis on December 30, 2008, did not indicate—unlike Comfort's notes of the first meeting he had with Davis on that day—that Davis did not want Comfort to file an appeal.

Our review of the record conclusively shows there was substantial competent evidence to support the district court's factual finding that on December 30, 2008, Davis directed Comfort not to file an appeal. First, Comfort testified that his notes of the first meeting stated, "Do not file appeal." Moreover, Comfort testified with regard to filing an appeal, "[I]t would have been [Davis'] choice, and I would have honored his request."

Second, Davis never controverted Comfort's testimony that he had advised his counsel not to file an appeal. On the contrary, Davis testified that after sentencing and prior to being imprisoned, he never asked Comfort to file an appeal. Indeed, as the district court correctly found in its original summary dismissal of Davis' motion:

> "In his motion, [Davis] did not allege that he asked his attorney to file an appeal. The
> court file does not reflect that [Davis] had ever asked that appellate counsel be appointed.

10

[Davis] does not allege in his motion that he had asked his attorney to file an appeal that he had failed to perfect or complete it."

These omissions first noted by the district court in its original ruling summarily dismissing Davis' motion were also found to be lacking after evidence was presented at the evidentiary hearing on the motion to reconsider:

"The Court finds [Davis] did not request that Mr. Comfort file a notice of appeal of his conviction or sentence within 10 days following sentencing. [Davis] does not allege and has failed to show that he was furnished an attorney . . . who failed to perfect and complete an appeal."

In short, not only did Davis fail to assert in his motion that he had asked Comfort to file an appeal, the evidence showed that Davis had directed Comfort *not to file an appeal*.

Finally, related to this factual finding, there was also evidence that Davis never sought an appeal within the statutory time frame. Davis acknowledges in his appellant's brief that he testified at the evidentiary hearing that "he did not instruct his attorney to file a notice of appeal." Moreover, on appeal Davis also concedes that the "first time he contacted Comfort about his appeal was by letter once he was already in prison." Comfort testified that Davis' letter was dated April 17, 2009, which was months after the expiration of the 10-day statutory requirement for Davis to file an appeal or the 21 days allowed to file a cross-appeal after the State filed its notice of appeal on January 13, 2009.

"Under a substantial competent evidence standard of review, it is not for this court to reweigh the evidence, substitute its evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses." *State v. Hartpence*, 30 Kan. App. 2d 486, 493, 42 P.3d 1197 (2002). We find there was substantial competent evidence to support the district court's finding that Davis directed Comfort not to file an appeal.

11

Returning to the primary issue raised by Davis on appeal, we next consider whether the district court erred in concluding that an *Ortiz* exception did not apply and, therefore, Davis was not permitted to file his untimely notice of appeal. In particular, we will consider Davis' claim that Comfort inadequately consulted with him about the advantages and disadvantages of filing a cross-appeal after the State filed its notice that it was appealing Davis' departure sentence.

Preliminarily, it is readily apparent that the legal theory Davis raises for the first time on appeal is at variance with the argument he presented in support of this issue in the district court.

As summarized in the earlier background section, in Davis' original pro se motion he relied on the *second Ortiz* factor—that he was not furnished an attorney to perfect an appeal, as the reason why he should be allowed to file an untimely appeal. After the district court granted Davis' motion to reconsider, his counsel reiterated this claim. In closing arguments at the evidentiary hearing, defense counsel argued that although Comfort testified he had discussed whether to appeal the case with Davis:

> "As to whether or not Mr. Davis understood this, Mr. Comfort was basically unable to answer that. He's, like I say, a 62 IQ.
>      . . . .
> ". . . At all times [Davis] thought he was going to be contacted by attorneys regarding the appeal, but this never happened. He always intended to appeal his conviction, and that never happened. Confused Ms. Trocheck with being his attorney. He didn't remember that she was the [prosecutor] at that time. That was his misunderstanding. He wished to file an appeal; he always did. No one will be prejudiced by this.
> > "I'm just asking that the Court allow him his Constitutional right to appeal this."

As is readily apparent, Davis' argument in the district court was not based on the third *Ortiz* exception. In the district court, Davis never raised the legal theory that the

12

third *Ortiz* exception applied because Comfort did not consult with him regarding filing a cross-appeal.

For the first time on appeal, Davis now argues that, apart from Comfort's consultation with him on December 30, 2008, about whether to appeal, once the State filed its notice of appeal on January 13, 2009,

> "a reasonable defendant in Davis' situation would have wanted to [cross-]appeal, and Comfort had a duty to discuss the [cross-]appeal with Davis in light of that fact. Because defense counsel acted unreasonably in failing to adequately consult with Davis about this fact, the *third Ortiz* exception should apply to allow the late filing of his notice of [cross-]appeal." (Emphasis added.)

Davis' argument focusing on the need for Comfort to counsel him about filing a cross-appeal was never raised by any motion filed by Davis. In the district court, Davis' attorney did not question Davis or Comfort about the need for Comfort to counsel Davis about a cross-appeal once the State filed its appeal. Moreover, this argument was never made by Davis' attorney at the evidentiary hearing and, as a result, the district court made no specific factual findings or legal conclusions regarding this legal theory.

The failure of Davis to raise this legal theory regarding a cross-appeal in the district court is consequential. As a general rule, issues not raised before the trial court may not be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). There are exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal. S*tate v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (stating exceptions). However, Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal.

13

Davis has failed to inform us why this new legal theory should be reviewed for the first time on appeal. In *State v. Williams*, 298 Kan. 1075, 1085-86, 319 P.3d 528 (2014), our Supreme Court held that litigants who fail to comply with this rule risk a ruling that the issue is improperly briefed, and the issue will be deemed waived or abandoned. Thereafter, the Supreme Court held that Rule 6.02(a)(5) would be strictly enforced. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015).

We find that Davis has waived and abandoned his claim that he should be allowed to file an untimely appeal because Comfort failed to consult with him about filing a cross-appeal. This legal theory was never asserted, argued, considered, or ruled upon in the district court. Moreover, Davis has failed to explain why this legal theory should be considered for the first time on appeal. For all these reasons, this issue is not properly before our court for review.

Assuming this issue had been preserved for appellate review, we find that it also fails on the merits. The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statutes. Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *State v. Smith*, 304 Kan. 916, 919, 377 P.3d 414 (2016).

It is uncontroverted that Davis did not file an appeal within the 10 days after sentencing or file a cross-appeal within 21 days after the State filed its appeal of the district court's durational departure sentence. Our Supreme Court has held, however, that three exceptions apply to the general rule barring an untimely appeal. *Ortiz*, 230 Kan. 733, Syl. ¶ 3. Those exceptions allow a defendant to file an appeal out of time when the defendant establishes that "(1) the defendant was not informed of his or her right to appeal; (2) the defendant was not furnished an attorney to pursue the appeal; or (3) the

14

defendant was furnished an attorney who failed to perfect the appeal." *Smith*, 304 Kan. 916, Syl. ¶ 3.

In making a successful argument under the third *Ortiz* exception "the defendant must establish that: (1) he or she told counsel to appeal, but the attorney failed to file or perfect the appeal; and, (2) he or she would have timely appealed, but for counsel's failure." *Smith*, 304 Kan. 916, Syl. ¶ 4.

At the outset, as we have previously concluded, there was substantial competent evidence to show that Davis instructed Comfort *not to file an appeal*. As a result, Davis has failed to prove the first essential element to successfully establish the third *Ortiz* exception. 304 Kan. 916, Syl. ¶ 4. Under these circumstances, as a general matter, Davis did not establish a basis under the third *Ortiz* exception to merit the district court's permission to file an untimely appeal or cross-appeal.

Davis, however, contends he is entitled to relief under the third *Ortiz* exception by relying on our Supreme Court's analysis in *State v. Shelly*, 303 Kan. 1027, 371 P.3d 820 (2016). In particular, he asserts that Comfort failed to advise him of the potential benefits and consequences of filing a cross-appeal after the State filed its notice of appeal. Davis does not argue that Comfort failed to discuss the potential benefits and consequences of an appeal altogether, only that he did not discuss the benefits and consequences of a cross-appeal once the State filed its notice of appeal. In making this argument, Davis asserts that a reasonable defendant in his position would have wanted to appeal because the potential risk of compromising his departure sentence was inevitable once the State filed a notice of appeal and nonfrivolous grounds existed to file an appeal.

In *Shelly*, our Supreme Court set forth a detailed account of the extensive factual and procedural background of this case. Highly summarized, Shelly pled no contest to unlawful distribution of a drug precursor and unlawful possession of a drug precursor,

both in violation of K.S.A. 2011 Supp. 21-5710. After sentencing, Shelly and his attorney discussed his appeal options with Shelly's attorney advising that "there was nothing to appeal." 303 Kan. at 1029. As a result, Shelly did not instruct his attorney to file an appeal.

Unbeknownst to Shelly's attorney, on the day of Shelly's sentencing, our Supreme Court issued an opinion in *State v. Snellings*, 294 Kan. 149, 158, 273 P.3d 739 (2012). According to our Supreme Court, the *Snellings* opinion "meant that Shelly's crimes of conviction could be subject to reclassification that would reduce his sentence." *Shelly*, 303 Kan. at 1029. After Shelly arrived at prison, he learned of the *Snellings* opinion and contacted his attorney about the case. His attorney did not take any action, but withdrew from the case, and a new attorney was appointed to represent Shelly.

The subsequent litigation focused on whether Shelly had shown an *Ortiz* exception to allow filing of an untimely appeal. The district court concluded that Shelly had not directed his attorney to file an appeal and that none of the three *Ortiz* exceptions applied to warrant the filing of an untimely appeal. Our court, in a published opinion, affirmed the district court. *State v. Shelly*, 49 Kan. App. 942, 318 P.3d 666 (2014), *rev'd* 303 Kan. 1027 (2016).

Our Supreme Court granted a petition for review and reversed our court and the district court. *Shelly*, 303 Kan. at 1027. Relevant to this appeal, the Supreme Court wrote that "[t]he standard of performance to be applied to measure the adequacy of appellate counsel under the third exception is that outlined in [*Roe v.*] *Flores-Ortega*, 528 U.S. [470,] 476-78, [120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000)]." *Shelly*, 303 Kan. at 1041.

Of importance to the resolution of Davis' claim is our Supreme Court's recitation, under *Flores-Ortega*, that "'a defendant who explicitly tells his attorney not to file an

16

appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently.'" *Shelly*, 303 Kan. at 1041.

Next, our Supreme Court reiterated *Flores-Ortega*'s teachings regarding an attorney's duty to consult about an appeal:

"In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, we believe the question whether counsel has performed deficiently by not filing a notice of appeal is best answered by first asking a separate, but antecedent, question:  whether counsel in fact consulted with the defendant about an appeal. We employ the term 'consult' to convey a specific meaning—advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered:  Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary, question:  whether counsel's failure to consult with the defendant itself constitutes deficient performance. That question lies at the heart of this case:  Under what circumstances does counsel have an obligation to consult with the defendant about an appeal?

. . . .

"We . . . hold that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. [Citations omitted.]" 528 U.S. at 478-80.

In *Shelly*, after our Supreme Court applied *Flores-Ortega* to the facts of the case, it concluded that "Shelly expressed a desire to appeal. He dropped the effort only when [defense counsel] told him there was nothing to appeal." *Shelly*, 303 Kan. at 1051.

17

After determining that Shelly met the first factor in the *Flores-Ortega* analysis, our Supreme Court reviewed the "next inquiry" which was "whether defense counsel adequately consulted with Shelly." *Shelly*, 303 Kan. at 1051. Our Supreme Court concluded that the consultation was insufficient:

> "While defense counsel clearly articulated the disadvantages of taking an appeal, he did not advise Shelly of the advantages, *i.e.*, preserving an argument in favor of application of the identical offense sentencing doctrine. The minimal advice given—that there was nothing to appeal—unreasonably overlooked at least potentially meritorious grounds for appeal and did not allow Shelly to knowingly and intelligently waive his right to appeal. The consultation was thus inadequate.
>
> "Because a rational defendant in Shelly's place would want to appeal on the Snellings identical offense issue, a duty to consult existed." *Shelly*, 303 Kan. at 1051.

Applying *Shelly* to the facts of this case, it is immediately apparent that Davis has failed to establish the prerequisites for filing an untimely appeal. First, unlike *Shelly*, Davis directed Comfort *not* to file an appeal. This fact is important, and it distinguishes this case from both *Flores-Ortega* and *Shelly* where the defendants expressed interest in appealing and did not direct that an appeal should not be filed. Under our case facts, the precedent of *Flores-Ortega* as cited by our Supreme Court in *Shelly* precludes an untimely appeal under the third exception of *Ortiz*: "'[A] defendant who explicitly tells his attorney *not* to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently.'" *Shelly*, 303 Kan. at 1041.

Second, unlike *Shelly*'s attorney, Comfort never advised Davis "there was nothing to appeal." See 303 Kan. at 1029. Comfort testified that he "absolutely" discussed with Davis the possibility of appealing the lifetime postrelease supervision aspect of the sentence because, in Comfort's opinion, it was cruel and unusual punishment. In fact, Comfort's motion for departure discussed this constitutional issue. All things considered, Comfort surmised that he "probably" encouraged Davis to file an appeal on those

18

constitutional grounds. Thus, it is apparent that Comfort, unlike Shelly's attorney, did highlight the advantages in appealing Davis' sentence at the December 30, 2008 meetings.

Third, Davis argues that under *Shelly*, Comfort was required to consult with him about a possible cross-appeal once the State filed its appeal of Davis' sentence on the last day permitted by statute. Of course, *Shelly* dealt with a direct appeal not a cross-appeal. See *State v. Herman*, 50 Kan. App. 2d 316, 328, 324 P.3d 1134 (2014) ("[T]he right to cross-appeal is a part of the general statutory right of appeal in both civil and criminal cases."). But assuming without deciding that *Shelly* would apply under the circumstances, Comfort testified that at one of the December 30, 2008 meetings with Davis the two men discussed whether to appeal *with knowledge that the State was going to appeal the sentence*. Comfort testified:

> "But we also had to consider how that would reflect on what might be done with an appeal, and we knew [an appeal] was going to be filed by the State, objecting to the degree of the durational departure, and whether it would complicate it, compromise it, or anything like that. That's the analysis that I recall going through, is, you know, could we win it? Was there a reasonable chance of changing the legislature through that iteration of the Supreme Court? And my opinion was no, and there's some notes in here, and a lot of research. But it was—it would have been [Davis'] choice, and I would have honored his request."

In short, there was substantial competent evidence that Comfort consulted with Davis on December 30, 2008, whether to file an appeal or cross-appeal, given Comfort's understanding that the State was going to appeal the significant durational reduction in Davis' sentence. Given this consultation, Davis has failed to show how additional discussion after the State, in fact, filed its appeal on January 13, 2009, was mandated under *Flores-Ortega* and *Shelly*.

19

In summary, we affirm the district court's ruling that Davis failed to show an *Ortiz* exception applies to permit him to file an untimely appeal. Davis' legal theory based on his reading of *Shelly* was not preserved for appeal and that claim is waived and abandoned. Assuming that claim was properly preserved, however, we hold that, under the totality of the circumstances, *Shelly* does not support application of the third *Ortiz* exception to allow Davis to file an untimely appeal.

Affirmed.